IN THE UNITED STATES COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | CIV. NO.: 15-083(DRD/SCC) |
| HECTOR ARROYO-MEDINA, | |
| Defendant. | |

## REPORT AND RECOMMENDATION

On the morning of January 27, 2015, agents of the Police of Puerto Rico ("POPR") along with officers from the United States Marshals Service Task Force, executed an arrest warrant against Defendant Hector Arroyo-Medina. During the course of the operation, a gun was found, and because Arroyo had a previous felony conviction, Arroyo was indicted in federal court. Docket No. 9. Arroyo moved to suppress the gun, as well as statements he made to law enforcement after his arrest, Docket No. 15, and that motion was referred to the under-

signed for report and recommendation by the presiding district judge, Docket No. 17. A suppression hearing was held in two parts on April 16 and 17, 2015, and now, after considering the parties' evidence and arguments, I recommend that the motion to suppress be granted.

## 1. Findings of Fact

At the hearing, the Government put on three witnesses: POPR Agent Torres-Rivera, Task Force Officer ("TFO") Salvador Nuñez-Zayas, and TFO Mirna Rivera-Torres. Arroyo also put on a full case, testifying himself along with his partner, Sasha Negrón, and her downstairs neighbor, Crystal Borrero. The parties' narratives differ sharply, and neither is entirely believable. But rather than describing the parties' disparate versions of the facts in detail, below I reconstruct the events of January 27, 2015, as I find that they happened, noting discrepancies and conflicts where appropriate.

As of January 2015, Arroyo and Sasha Negrón were engaged in an intimate relationship. Negrón lived with her young child at the Dr. Pila Public Housing Project in Ponce, Puerto Rico. Arroyo lived with his grandmother but stayed with Negrón on the weekends. On January 15, an argument between Negrón and Arroyo turned violent, with Arroyo

threatening Negrón with a knife. *See* Docket No. 29-2, at 1. Negrón went to the police and made a complaint against Arroyo, and an arrest warrant issued on January 16. *See id.* The POPR prepared a work plan and determined to execute the arrest warrant at Negrón's residence. The work plan noted that Arroyo was "[p]resumed to be armed" and "has a violent temper." Docket No. 29-1, at 3.

On the morning of January 27, 2015, the agents who would execute the arrest warrant met around 5:00 a.m. and then proceeded to the Dr. Pila project to execute the warrant, arriving sometime after 5:30 a.m. The entry was performed by five agents: TFO Nuñez, who was the point person, TFO Rivera, TFO Miguel Espada-Martínez, POPR Agent Edwin Figueroa-Malavé, and Agent Torres.[1] The agents announced

---

**1.** Agent Torres and TFOs Nuñez and Rivera testified at the hearing, and all were in the courtroom when Negrón later took the stand. Negrón testified that none of the agents who she saw in court were present during the intervention. Indeed, Negrón testified that no female agents were present at all. I find this testimony incredible for several reasons. First, all three witnesses were listed on the action plan, and it is highly unlikely they'd have all missed the raid and chosen to falsely testify later about their presence. Second, given that the agents were responding to what amounted to a domestic violence complaint at what they knew to be the victim's home, it is doubtful that they would proceed without the presence of a female officer. And third, I find

their presence and then breached the door when no one answered.[2] After securing the living room, the agents proceeded to a hallway. In the bathroom, they encountered Negrón, who was nude. TFO Rivera stayed with Rivera throughout the rest of the intervention.[3] TFO Espada and Agent Figueroa went to secure a room with an open door, while Agent Torres and TFO Nuñez knocked on a closed one. When the agents threatened to break down the door, Arroyo opened it. Arroyo, who was wearing only his underwear, was placed on the bed and immediately arrested by Agent Torres. Though no witness testified to this fact, I find, based on the agents' belief that Arroyo was dangerous, as well as my general familiarity with police procedure in similar circum-

---

suspect Negrón's (and Borrero's) testimony that the agents who entered her home wore the blue uniforms of POPR patrol officers; in my experience, TFOs wear civilian clothes, not patrol uniforms.

**2.** I find non-credible Negrón's testimony that the agents neither knocked nor shouted. Indeed, her testimony was contradicted in this regard by both Arroyo and Borrero.

**3.** Negrón and Arroyo testified that they both were in the bedroom when the police entered, and Negrón testified to witnessing the interactions between Arroyo and the agents that followed. Especially in light of my other credibility findings regarding Negrón, I credit the agents' testimony that Negrón was found in the bathroom.

stances, that Arroyo's hands must have been cuffed behind his back.

The events that happened next are at the heart of this case. According to Arroyo, he was quickly removed from the apartment, still wearing his underwear. More credibly, Agent Torres testified that Arroyo asked to be allowed to dress before being taken outside. I am unable to determine whether Agent Torres or Arroyo initiated the search for Arroyo's clothes, but I find that Arroyo, at the least, acquiesced in the decision. Agent Torres testified that Arroyo then pointed at a small, two-drawer dresser in the corner of the room.[4] For several reasons, I cannot credit Agent Torres's testimony that Arroyo specifically pointed towards the dresser. First, it is contradicted by the testimony of TFO Nuñez, who stated that Arroyo "said that the clothes were there in that corner, in that area." Second, Arroyo, with his hands cuffed behind his back, would not have been able to point at any specific object. Third, the testimony of both Arroyo and Negrón, which I find credible on this point,

---

**4.**  Agent Torres testified that after he arrested Arroyo, "[h]e asked us not to take him away that way, that he wanted to get dressed. He was sat on the bed. He pointed to a dresser there was for me to get pants for him."

was that the dresser held only Negrón's clothes;[5] Arroyo did not live at Negrón's apartment, and the clothes that he had there were the ones that he had worn over, which were on the floor near Negrón's child's crib.[6] And fourth, Arroyo admitted possession of the gun, and so he surely knew where it was. Together, these factors lead me to find that Arroyo did not specifically tell Agent Torres to open the dresser, which did not contain his clothes but did contain a firearm that he would have wanted to keep hidden from the agents. What I find

---

**5.** On cross-examination, Agent Torres testified that the dresser held men's and women's underwear. I do not find this testimony credible. Frankly, Agent Torres seemed to have no recollection whatsoever of what clothes were in the drawer, and I find that his statement that it held men's underwear to have been a self-serving attempt to bolster his story. And, notably, it fails in this regard too: if the drawer indeed held mens underwear, there would still have been no reason for Arroyo to ask for clothes out if it, given that he was already wearing underwear.

**6.** As shown by Defendant's Exhibit A, the dresser is in a corner and the crib is just next to it. Curiously, Agent Torres testified that there was no crib in the room when he entered it. I find that Agent Torres was mistaken on this point, given that both Arroyo and Negrón testified to the contrary and that Negrón undoubtedly had her child living with her at the time of the incident. This, along with the fact that, contrary to his hearing testimony, Agent Torres inexplicably told an FBI agent on January 29, 2015, that TFO Espada entered the bedroom with him and TFO Nuñez, leaves me with some doubts about the veracity of Agent Torres's testimony on this and other points.

happened, then, was that he gestured—physically and/or verbally—to the corner, where his clothes lay on the floor.

In any event, Agent Torres proceeded to open the bottom drawer of the dresser. Upon doing so, he noticed "a black [fannypack] on top of the clothes." Agent Torres testified that he immediately picked the fannypack up: "When I saw that [fannypack] I picked it up, and as I picked it up the sound that I heard inside [the fannypack] based on my experience was a sign that there were bullets inside." And upon hearing the sound that he identified as bullets, Agent Torres immediately opened the fannypack:

> I opened one of the zippers of this [fannypack]—it had two zippers. When I opened the first zipper, there was a box of bullets inside it. When I opened the other zipper, there was a small nickel-plated pistol with a black grip. That firearm was loaded. That evidence was seized. The gentleman was given his pants and was removed from the apartment.

Notably, Agent Torres at no point testified that he could feel or otherwise sense that a firearm was in the fannypack. Neither did Agent Torres testify as to where he ultimately found

Arroyo's pants.[7] Arroyo was taken from the scene, and he subsequently made inculpatory statements to law enforcement agents regarding the seized firearm.

### 2. Analysis

After arresting Arroyo, and without a search warrant, Agent Torres opened the closed drawer of a dresser, removed a fannypack, and, upon opening the fannypack, found a gun. The question is whether, in the absence of a search warrant, Agent Torres had any legal basis for opening these two closed containers, and thus for finding and seizing the weapon. After reviewing the possible justifications for Agent Torres's actions, I conclude that while opening the dresser drawer was likely permissible, Agent Torres's subsequent decisions to remove

---

**7.** And neither did TFO Nuñez, who could not remember what clothes Arroyo was given or even if Arroyo was wearing shoes when he was taken out of the apartment. Arroyo testified that he was undressed when taken to the police station and that his aunt had to bring him clothes later. Borrero, who testified to having watched Arroyo being put in the police car from her apartment door's peephole, made a similar claim. Arroyo's and Borrero's testimony, along with the lack of specificity from TFO Nuñez and Agent Torres regarding what clothes Arroyo was given and where they were found, leave me suspicious about whether Arroyo was ultimately dressed at all. For the reasons explained below, however, I find the answer to this question unimportant to the resolution of Arroyo's motion.

and then open the fannypack cannot be justified. Accordingly, I recommend that the motion to suppress be granted.

### 2.1 The discovery of the gun is not justified as the product of a protective sweep or of a search incident to arrest.

Warrantless searches of homes are "presumptively unreasonable." *United States v. Tibolt*, 72 F.3d 965, 968 (1st Cir. 1998). There are, of course, exceptions, among them the "protective sweep" and "search incident to arrest" doctrines. *See Chimel v. California*, 395 U.S. 752, 763 (1969) (articulating the "search incident to arrest" doctrine); *Maryland v. Buie*, 494 U.S. 325, 336 (1990) (articulating the "protective sweep" doctrine). *Buie* permits the "cursory visual inspection of those places in which a person might be hiding." 494 U.S. at 327; *see also United States v. Nascimento*, 491 F.3d 25, 49 (1st Cir. 2007) (explaining that protective sweeps are justified "by the potential threat posed by unseen third parties who may be lurking on the premises"). Of course, a person could not have been hiding in the small dresser, much less in the fannypack. As such, the discovery of the gun was not justified by the protective sweep doctrine. *Nascimento*, 491 F.3d at 50 (finding *Buie* inapplicable where "the cabinet searched was too small to accommodate a person").

Though it presents a somewhat closer case, neither does the

*Chimel* doctrine permit the search of the dresser and fannypack.[8] In *Chimel*, the Supreme Court held that officers making arrests were permitted to search the area "into which an arrestee might reach in order to grab a weapon or evidentiary item." 395 U.S. at 763. The Court explained that the purpose of this rule was to protect evidence and officer safety by "remov[ing] any weapons that the [arrestee] might seek to

---

**8.** It is plain that the agents were not, in fact, performing a search incident to arrest when they looked in the dresser. By their own testimony, they looked in the dresser (and nowhere else) in order to find Arroyo clothes, not search for hidden dangers. Nonetheless, caselaw permits the Government's *post hoc* reliance on the search-incident-to-arrest exception where "objective" factors would have supported its application, even when the searching agents were in fact motivated by none of the concerns underlying the exception. *See, e.g., United States v. Nelson*, 725 F.3d 615, 622 (6th Cir. 2013) (finding search valid incident to arrest because "[a]n arresting officer's 'subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause'" (quoting *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004))); *United States v. Salamasina*, 615 F.3d 925, 930 (8th Cir. 2010) (applying an "objective officer" test in the search-incident-to-arrest context); *see also Ashcroft v. Al-Kidd*, 131 S. Ct. 2074, 2080 (2011) (holding that where a search was justified by objective circumstances, it is deemed "reasonable '*whatever* the subjective intent' motivating the relevant officials" (quoting *Whren v. United States*, 517 U.S. 806, 814 (1996))). *But see United States v. Johnson*, 16 F.3d 69, 72 (5th Cir. 1994) (rejecting *Chimel* doctrine where the officer "never felt threatened" and was not concerned about destruction of evidence"), *modified on reh'g*, 18 F.3d 293 (5th Cir. 1994).

use in order to resist arrest or effect his escape." *Id.* However, the Court circumscribed the area that may be searched incident to a valid arrest to those places within the arrestee's "immediate control," meaning "the area from within which he might gain possession of a weapon or destructible evidence." *Id.* Thus, the Court expressly prohibited a search of "all the desk drawers or other closed or concealed areas in" the room in which a person was arrested. *Id.*

In a subsequent case, *New York v. Belton*, the Supreme Court applied *Chimel* in the automobile context, holding that after arresting a car's occupant, an officer may, "as a contemporaneous incident of that arrest, search the passenger compartment of that automobile." 453 U.S. 454, 460 (1981). The Court's holding was based on the assumption that "articles inside the relatively narrow compass of the passenger compartment of an automobile are in fact generally, even if not inevitably, within 'the area into which an arrestee might reach in order to grab a weapon or evidentiary ite[m].'" *Id.* (quoting *Chimel*, 395 U.S. at 763). After *Belton*, courts read it and *Chimel* to permit searches incident to arrest of astonishing breadth. *See Arizona v. Gant*, 556 U.S. 332, 341 (2009) (lamenting that *Belton* had "been widely understood to allow a vehicle search incident to the

arrest of a recent occupant even if there is no possibility that the arrestee could gain access to the vehicle at the time of the search"). This expansion, notably, was not confined to automobile cases. *See* 3 WAYNE R. LAFAVE, SEARCH & SEIZURE § 5.5(a) nn. 30–38 & surrounding text (5th ed.) (collecting cases applying *Belton* and "doubt[ing] that such a broad search authority is either necessary or desirable").

In a concurrence in *Thornton v. United States*, Justice Scalia suggested that these broad interpretations of *Belton* should be reigned in. 541 U.S. 615, 625 (2004) (Scalia, J., concurring in judgment). In *Thornton*, a search had been performed while the arrestee was handcuffed in a squad car. *See id.* Justice Scalia noted that the argument that such a search could be justified by *Chimel*'s rationales—law enforcement safety or protection of evidence—"call[ed] to mind Judge Goldberg's reference to the mythical arrestee 'possessed of the skill of Houdini and the strength of Hercules.'" *Id.* at 625–26 (quoting *United States v. Frick*, 490 F.2d 666, 673 (5th Cir. 1973) (Goldberg, J., concurring in part and dissenting in part)). Justice Scalia further suggested that fears that handcuffed arrestees could access weapons not already on the officer or their own person "speculative" and "far from obvious." *Id.* at 626; *see also id.* (discussing instances

where police had been injured by handcuffed prisoners and finding that, with one exception, they did not involve the use of weapons other than those on the arrestee's or officer's person). Justice Scalia went on to suggest that a search must be justified *at the time of the search*, not at the time of the arrest, as many courts had held. *Id.* at 627–28. Justice Scalia concluded that many *Belton* searches were, in fact, "'exploratory,'" and unmoored in the constitution. *Id.* at 628–29 (quoting *United States v. McLauhglin*, 170 F.3d 889, 894 (9th Cir. 1999) (Trott, J., concurring)).

I mention Scalia's concurrence in *Thornton* because it was adopted by a majority of the Court in *Arizona v. Gant*. *See Riley v. California*, 134 S. Ct. 2473, 2492 (2014) (explaining that *Gant* was based on Justice Scalia's opinion in *Thornton*, and thus inquiring into its rationale). In *Gant*, the Court clarified that a search incident to an arrest must be justified by *Chimel*'s rationales—officer safety or protection of evidence—at the time the search is made. 556 U.S. at 343. The Court thus held that a search of a vehicle incident to arrest is justified "only when the arrestee is unsecured *and* within reaching distance of the passenger compartment." *Id.* (emphasis added). *Gant* furthermore makes clear that the applicability of *Chimel* to a specific

case is governed not by a bright-line rule, but instead by a fact-specific determination of whether the search was reasonable under *Chimel*'s rationale. *Id.* at 344 (holding that a search incident to arrest was not permissible "[b]ecause police could not reasonably have believed . . . that Gant could have accessed his car at the time of the search").

Though *Gant* was an automobile case, its extensive treatment of *Chimel* indicates that it should be understood to apply broadly to searches incident to arrests. *See, e.g.*, 3 SEARCH & SEIZURE § 6.3(c) (opining that "the *Gant* specification that there is the requisite 'possibility of access' only when the arrestee is unsecured and within reaching distance" is "presumably likewise relevant in the premises-search cases").[9] It is thus notable that *Gant* rejected cases where, in the vehicle context, courts had upheld *Chimel* searches despite the arrestee having

---

**9.** That said, the *Gant* Court also held that a vehicle search incident to arrest could be justified by a reasonable belief that "evidence of the offense for which [the defendant] was arrested might have been found" inside the vehicle. *Arizona v. Gant*, 556 U.S. 332, 344 (2009). This justification, however, applies *only* in the vehicle-search context. *Id.* at 343 (holding that such a search is based on "circumstances unique to the vehicle context"); *see also* 3 WAYNE R. LAFAVE, SEARCH & SEIZURE § 5.5(a) (5th ed.) (opining that this exception to the warrant requirement has "no application whatsoever" in the premises-search context).

been cuffed or removed from the scene altogether. *Gant*, 556 U.S. at 342–43 nn. 2–4 & surrounding text (collecting such cases and rejecting their rationale). I thus read *Gant*'s language in this regard—as well as Justice Scalia's *Thornton* concurrence—as casting doubt on those premises-search cases that have likewise made "the questionable assumption that persons arrested and restrained by police are nonetheless possessed of considerable freedom of movement." 3 SEARCH & SEIZURE § 5.5(a); *see also id.* (criticizing cases that have failed to "give particular consideration to the likelihood that the arrestee would have any opportunity to reach [a] container *and* manip-ulate the zippers, hasps, or other fastening devices in order to get at a weapon or evidence inside a container"); *cf. Gant*, 556 U.S. at 339 (taking special note of the fact that the arrestees in *Belton* had not been handcuffed (citing *Belton*, 453 U.S. at 456)). Finally, it may well be that after *Gant*, law enforcement has a duty "to take available steps to ensure against" an arrestee's access to places where weapons might be hidden. *Id.* After all, *Gant* suggested that searches incident to arrest should be "the rare case" because law enforcement has "many means of ensuring the safe arrest of vehicle occupants" and is thus usually able to "fully effectuate an arrest so that a real possibil-

ity of access to the arrestee's vehicle" does not exist. *Gant*, 556
U.S. at 343 n.4; *see also Thornton*, 541 U.S. at 627 (Scalia, J.,
concurring) (explaining that "conducting a *Chimel* search" is
"an exception," not "the Government's right," and suggesting
that proper procedure is to secure arrestees and obviate the
need for any search). There is no compelling reason why this
reasoning fails in the premises context. Indeed, vehicle arrests
are often unforeseen, and the officer performing them may
well be alone. In the home context, as here, arrests are more
often planned, and law enforcement is well-manned, well-
armed, and has the element of surprise.

In this case, at the time Agent Torres opened the dresser,
there was no realistic possibility that Arroyo could reach the
gun subsequently found inside the fannypack. Arroyo was
secured—handcuffed, with Agent Nuñez hovering over
him—and the gun was in a closed container inside another
closed container. The inside of the fannypack was thus not in
Arroyo's "immediate control," and so no search was permissi-
ble.

Even before *Gant*, Judge Posner made a similar point in
*United States v. Tejada.* In that case, the defendant was arrested
in his "tiny" apartment; in the course of his arrest, he reached

for a gun in his waistband. *See* 524 F.3d 809, 811–12 (7th Cir. 2008). After the defendant was arrested and cuffed behind his back, the agents opened a cabinet in an entertainment center, as well as a blue bag in the cabinet closed with a zipper (and then yet another bag, in which they found cocaine). *See id.* Though it was "unlikely" that the defendant would have been able to lunge for a weapon in the cabinet, the court concluded that the police were nonetheless justified in opening it: it was only "a few steps" away from the defendant, and the cops "did not know how strong [the defendant] was, and he seemed desperate." *Id.* at 812. But, Judge Posner wrote, while it was "conceivable" that the defendant could have reached the cabinet, "it [was] inconceivable that having opened the cabinet door he would have had time to unzip the travel bag without being wrestled to the floor" by the police. *Id.* The same logic applies here: it is unlikely, but not impossible, that Arroyo could have reached the dresser;[10] it is inconceivable that he

---

**10.** Given that *Tejada* and other cases mention the arrestee's strength in considering whether a handcuffed arrestee could gain access to a hidden weapon, I note that Arroyo is a small and thin man—the arrest plan puts him at 5-foot, 3-inches and 134 pounds, which seems right—and would have been easily overpowered by the much larger agents in the room with him had he made any move toward the

could have reached the dresser, opened the drawer, removed the fannypack, and then unzipped the correct zipper of the bag and removed the gun all before being subdued by the two agents in the room with him.[11] A contrary ruling in this case—a holding that after securing and arresting a room's occupant, the police may search not only cabinets, dressers, and closets, but the closed containers within them—would turn the narrow *Gant*/*Chimel* exception into permission to perform a general search. *Cf. United States v. Irizarry*, 673 F.2d 554, 559 n.* (1st Cir. 1982) (warning against a holding that would "allow warrantless searches of unlimited scope" on the basis of "any

---

dresser.

**11.** *Tejada* went on to affirm the lower court's denial of the defendant's suppression motion on three bases. *United States v. Tejada*, 524 F.3d 809, 813–14 (7th Cir. 2008). First, it held that because the police had prior knowledge of what was in the bag, its contents were in plain view, *id.* at 813–14; I discuss the plain view doctrine below. Second, it held that discovery of the cocaine was inevitable, *id.*; for reasons discussed below, such a result is foreclosed in this case by First Circuit precedent. And third, it relied on cases permitting searches of areas under the defendant's control at the time of his arrest, even if they were no longer under his control at the time of the search, *id.* at 812; as explained above, however, this line of cases was rejected by *Gant*, which made clear that searches incident to arrest are to be judged by circumstances at the time of the *search*, 556 U.S. at 343.

plausible or implausible sequence of events [that] might link a defendant with a gun's potential hiding place").

At the time the agents searched the dresser, the gun inside the fannypack was well beyond Arroyo's reaching distance and outside of his immediate control. *See Gant*, 556 U.S. at 343. I conclude that *Chimel* did not permit the search of the fannypack.[12]

### 2.2 Exigent circumstances justified the agents' opening of the dresser drawer.

Despite the general prohibition on warrantless searches, they may be permitted, under certain circumstances, upon the existence of exigent circumstances. *United States v. Samboy*, 433 F.3d 154, 158 (1st Cir. 2005). "The Government bears the

---

**12.** The First Circuit's holding in *United States v. Nascimento* is not to the contrary. In that case, the Circuit affirmed the application of the *Chimel* exception to a search of an "unlocked cabinet" on the top shelf of a closet. *See* 491 F.3d 25, 49 (1st Cir. 2007). First, the First Circuit's account of the facts suggests that the closet was not closed, and the cabinet was not apparently fastened shut in any way, making the gun found inside it significantly more accessible than the fannypack in this case. *See id.* More importantly, the defendant in *Nascimento* was not handcuffed until *after* the gun was found, *see id.*, a fact which greatly increased the officers' risk, and concomitantly their need to secure the cabinet in the defendant's reaching distance. *Cf. Gant*, 556 U.S. at 339 (suggesting that *Belton*'s result was justified in part by the arresting officer's inability to handcuff the arrestees).

burden of proving exigent circumstances." *Id.* The First Circuit
has suggested that upon arresting an undressed person, "the
need to dress him may constitute an exigency justifying the
officers in entering another room in order to obtain needed
clothing." *Nascimento*, 491 F.3d at 50 (citing *United States v.
Gwinn*, 219 F.3d 326, 333 (4th Cir. 2000)). *But see United States v.
Kinney*, 638 F.2d 941, 945 (6th Cir. 1981) ("The defendant did
not request permission to secure additional clothing and did
not consent to an entry of his home. Entry cannot be justified
on these grounds.").

In *Nascimento*, the First Circuit was not explicit about the
standard by which a court should judge an exigency of this
sort. *See id.* ("Generalizations are hazardous because one can
imagine infinitely variable fact patterns."). It did note that in
that case, the cool climate of the place of arrest—Massachusetts
in December—supported a finding of exigency. *Id.*; *see also
Gwinn*, 219 F.3d at 333 (referring to the "increasing chill during
the evening hours of an early May day" in West Virginia);
*United States v. Titus*, 445 F.2d 577, 579 (2d Cir. 1971) (Friendly,
J.) (noting that the decision to clothe the prisoner was made
"on a December night" in New York). Here in Puerto Rico, of
course, concerns about chills don't get the Government very

far.[13] And neither did the Government suggest any other reason for dressing Arroyo, at least in terms of his safety. But *Nascimento* suggests an additional, broader rationale: "human dignity." *Nascimento*, 491 F.3d at 50. This suggests that police may generally require an undressed arrestee to put on clothes before being removed from the place of arrest. *Cf. United States v. Di Stefano*, 555 F.2d 1094, 1101 (2d Cir. 1977) (holding that "officers had a *duty* to find clothing for [the defendant] to wear or to permit her to do so"); *see also* 3 SEARCH & SEIZURE § 6.4(a) ("Assuming a lawful arrest at the defendant's residence, it does not seem at all unreasonable for the police to require the defendant to don street clothing, without regard to his wishes."). Given the breadth of the First Circuit's holding in this regard, then, I will assume that the agents were entitled to conduct a search reasonably aimed at finding Arroyo clothes.

*Nascimento* refers specifically to the authority to enter a room to look for clothing. Logic suggests, however, that where an exigency permits entry into a room, it would also permit entry into a container—like a dresser—the officer reasonably

---

**13.** According to Weather Underground's almanac, the *low* temperature in Ponce on January 27, 2015, was 75 degrees Fahrenheit. *See* http://www.wunderground.com.

believes will contain clothing. *Cf. United States v. Rudaj*, 390 F. Supp. 2d 395, 405 (S.D.N.Y. 2005) (holding that because police have "no more leeway to invade the privacy unnecessarily of an insufficiently dressed arrestee than they have with the fully dresesd," the clothing exception permits only a narrow class of searches), *aff'd sub nom.*, *United States v. Ivezaj*, 568 F.3d 88 (2d Cir. 2009). Here, I find that the agents were justified in opening the dresser drawer. As noted previously, Arroyo gestured to the general area where the dresser sat. Though he was in fact gesturing to his clothes on his ground, the record does not suggest that he specifically told the agents to give him the shorts that were outside of the dresser, nor did he specifically tell the agents not to open the dresser. Agent Torres was thus justified in opening the dresser—an obvious place to find clothes—in order to look for something for Arroyo to put on. The more difficult question, though, is whether, upon opening the drawer, Agent Torres was justified in removing and opening the fannypack he found.[14] The answer depends on the

---

**14.** In a sense Arroyo can be said to have consented to the opening of the dresser. *See United States v. Winston*, 444 F.3d 115, 117, 121 (1st Cir. 2006) (finding consent to search a nightstand where, asked for the location of his wallet, the defendant "pointed to the nightstand with his shoulder," despite the fact that "the agents did not explicitly ask for

application of the plain view doctrine, which is discussed below.

## 2.3 The plain view doctrine did not permit the opening of the fannypack.

In *Coolidge v. New Hampshire*, a plurality of the Supreme Court explained that the plain view doctrine applies where law enforcement, having legally reached their vantage point, comes "inadvertently across a piece of evidence incriminating the accused." 403 U.S. 443, 466 (1971) (plurality opinion); *see also Texas v. Brown*, 460 U.S. 730, 738–39 (1983) (plurality opinion) (explaining that the doctrine is "better understood" as "an extension of whatever the prior justification for an officer's access to an object" is, rather than as "an independent exception to the warrant" requirement (internal quotations omitted)). In such circumstances, warrantless seizure of the evi-

---

permission to open the drawer to retrieve [the defendant's] identification"). This amounts to an alternative justification for the agents' opening of the dresser drawer. However, that consent was for the specific purpose of retrieving clothes and would not have extended to the removal or opening of the fannypack. *United States v. Marshall*, 348 F.3d 281, 286 (1st Cir. 2003) ("Warrantless searches may not exceed the scope of the consent given."). Thus, regardless of the justification for opening the drawer, the propriety of removing and opening the fannypack turns on the discussion of the plain view doctrine that follows.

dence is permissible if its incriminatory nature is "immediately apparent." *Id.*[15] In *Horton v. California*, the Supreme Court formulated *Coolidge*'s holding into a three-part test: first, the officer must legally "arriv[e] at the place from which the evidence could be plainly viewed"; second, the evidence must be "in plain view" and its incriminating nature must be "immediately apparent"; and third, the officer must "have a lawful right of access to the object itself." 496 U.S. at 136–37; *see also United States v. Paneto*, 661 F.3d 709, 713 (1st Cir. 2011) (elucidating a similarly-worded test). Applying these principles, courts have routinely permitted the seizure of incriminating evidence seen in plain view during clothing searches (consensual or otherwise). *See, e.g.*, *Winston*, 444 F.3d at 117 (cash found in nightstand); *United States v. Butler*, 980 F.2d 619, 620–21 (10th Cir. 1992) (shotgun found in bedroom); *Rudaj*, 390

---

**15.** In *Texas v. Brown*, a plurality of the Court suggested that *Coolidge*'s use of "immediately apparent" was "very likely an unhappy choice of words, since it can be taken to imply that an unduly high degree of certainty as to the incriminatory character of evidence is necessary for an application of the 'plain view' doctrine." 460 U.S. 730, 741 (1983). Nonetheless, the Court subsequently continued to use *Coolidge*'s "immediate apparent" formulation, *e.g.*, *Horton v. California*, 496 U.S. 128, 136 (1990), as has the First Circuit, *e.g.*, *United States v. Sanchez*, 612 F.3d 1, 5 (1st Cir. 2010).

F. Supp. 2d at 406 (shotgun found in closet).

Here, though, the firearm was not in plain view when Agent Torres opened the dresser drawer. Rather, from that vantage point, Agent Torres could see only the fannypack atop women's underwear. Indeed, before finding the gun Agent Torres had to pick the fannypack up, manipulate it, hear a sound, decide that sound was loose bullets, open one of the fannypack's zippers, find a box of bullets, and then open the fannypack's *other* zipper. Whether opening the fannypack was allowed, then, turns on whether the plain view doctrine allows the manipulation and opening of a closed container.

To begin with, it is necessary to distinguish between searches and seizures. As a general matter, when police have plain view of a container that, on probable cause, they believe to contain contraband or evidence, they may *seize* it. *Arizona v. Hicks*, 480 U.S. 321, 326–27 (1987); *see also Brown*, 480 U.S. at 742–43 (plurality opinion) (permitting the warrantless *seizure* of a balloon that the police had probable cause to believe held cocaine). They may not, however, *search* the container without first obtaining judicial authorization. *Brown*, 480 U.S. at 747 (Stevens, J., concurring) ("[A] closed container may not be opened without a warrant, even when the container is in plain

view and the officer has probable cause to believe contraband is concealed within." (citing *United States v. Chadwick*, 433 U.S. 1 (1977)); *United States v. Ross*, 456 U.S. 798, 812, 824 (1982) (referring to the "general principle that closed packages and containers may not be searched without a warrant," but finding an exception in the automobile context); *United States v. Doe*, 61 F.3d 107, 111 (1st Cir. 1995) ("Although probable cause, as well as exigent circumstances, may support the warrantless *seizure* of an enclosed opaque container, the *same* probable-probable-cause showing is not necessarily sufficient to justify its subsequent warrantless *search*.").

An exception to this general prohibition on warrantless searches exists in certain circumstances. For example, if the container is "one of those rare single-purpose containers which 'by their very nature cannot support any reasonable expectation of privacy because their contents can be inferred from their outward appearance,'" a search is admissible under the plain view doctrine. *Brown*, 460 U.S. at 750–51 (Stevens, J., concurring) (quoting *Arkansas v. Sanders*, 442 U.S. 753, 764 n.13 (1979)); *see also Sanders*, 442 U.S. at 764 n.13 (referring to "a kit of burglar tools or a gun case"); *United States v. Meada*, 408 F.3d 14, 23 (1st Cir. 2005) (discussing the plain view doctrine in the

context of a gun case). Similarly, "in some cases"—such as where the container is open or transparent—"the contents of a package will be open to 'plain view,' thereby obviating the need for a warrant." *Sanders*, 442 U.S. at 764 n.13.[16] And finally, some cases have suggested that where senses other than sight—like smell, in the case of marijuana, or touch, in the case of malleable bag—make a container's contents obvious, search may be appropriate on a "plain sense" theory. *See, e.g., United States v. Williams*, 822 F.2d 1174, 1185 (D.C. Cir. 1987) (permitting search where "sensory information acquired by the officer" regarding the container's contents "rises to a state of certitude"); *see also* 3 SEARCH & SEIZURE § 5.5(f) nn. 191–98 & surrounding text (collecting "plain touch" and "plain smell"

---

**16.** *Sanders* held that despite probable cause justifying a search of an automobile, a warrant was required to search a closed container found inside the car. *Arkansas v. Sanders*, 442 U.S. 753 (1979). Subsequent cases have abrogated *Sanders*'s specific holding and have applied the automobile exception to the warrant requirement to allow probable cause searches of cars and closed containers found within them. *California v. Acevedo*, 500 U.S. 565 (1991); *United States v. Ross*, 456 U.S. 798 (1982). Outside of the automobile context, however, *Sanders*'s discussion of the plain view doctrine remains good law. *See, e.g., United States v. Meada*, 408 F.3d 14, 23 (1st Cir. 2005) (noting that *Sanders*'s abrogation was on grounds unrelated to its discussion of the plain view doctrine); *United States v. Doe*, 61 F.3d 107, 112 n.8 (1st Cir. 1995) (applying *Sanders*'s footnote 13).

cases).[17] However, such a justification for a search would seem to be precluded by First Circuit precedent. *See United States v. Jimenez*, 419 F.3d 34, 40 (1st Cir. 2005) ("Where the odor of a forbidden substance is identified by someone found qualified to know the odor, there may well be probable cause to justify the issuance of a search warrant, but it is not sufficient to justify a warrantless search." (citations omitted)).

Here, Agent Torres saw the fannypack and he immediately picked it up. Notably, he did not testify that he picked it up so as to get at the clothes underneath. To the contrary, based on his testimony, it appears that he picked it up for the purposes

---

**17.** In *Minnesota v. Dickerson*, 508 U.S. 366 (1993), the Supreme Court held that during a frisk of a person, police are entitled to seize items that, on probable cause, they believe to be weapons or contraband. This standard does not apply to searches of containers not on a detainee's person. *See* 3 SEARCH & SEIZURE § 2.2(a) (opining that "it should not be assumed that . . . *Dickerson* sheds any light on" the question); *cf. United States v. Childs*, Crim. No. 06-10339, 2008 WL 941779, at *10 (D. Mass. April 4, 2008) (rejecting *Dickerson*'s applicability in the container-search context). Indeed, permitting container searches on a mere showing of probable cause would "completely swallow[] the warrant requirement for containers." 3 SEARCH & SEIZURE § 5.5(f). Professor LaFave thus suggests that while the relevant precedent lacks clarity, "the better view is that" a plain sense container search is appropriate "only upon a 'virtual certainty' as to the package's contents." 3 SEARCH & SEIZURE § 6.7(b). After all, such a standard comports with the level of certainty that plain view of an item generally affords.

of examining it. Indeed, in going through a dresser drawer to find clothes, one would not normally lift and manipulate an item placed on top; one would move it to the side and pick up the clothes underneath. It is probable, then, that Agent Torres's initial manipulation of the bag—his picking it up and moving it so that he could hear what was inside—was itself a violation of the Fourth Amendment.

In *Hicks*, the Supreme Court held that when an officer slightly moved a piece of stereo equipment in plain view so as to see the equipment's serial number, that officer performed a search. 480 U.S. at 324–25. Further, because the officer in *Hicks* did not have a search warrant, and because his "lawful objective" in the apartment was to search for a "shooter, victims, and weapons," the search of the stereo violated the Fourth Amendment because it was "separate and apart from" the officer's lawful purpose for being there. *Id.*; *see also id.* at 325 ("But taking action, unrelated to the objectives of the authorized intrusion, which exposed to view concealed portions of the apartment or its contents, did produce a new invasion of respondent's privacy unjustified by the exigent circumstances that validated the entry."). Nothing in Agent Torres's testimony indicated that his decision to pick the fannypack up and

examine it was related to his "lawful objective" in opening the drawer, which objective was to find Arroyo clothes. Accordingly, *Hicks* suggests that the examination of the fannypack itself violated the Fourth Amendment,[18] and so anything flowing from that manipulation—the sound, the bullets, the gun—would be the fruit of that violation.

More to the point, even if Agent Torres had a legal justification for manipulating the fannypack—and thus for hearing the sound he believed to be bullets—at best, that fact would have given him probable cause to *seize* the fannypack. In no case could he have *searched* it. Agent Torres testified that when he manipulated the bag, he heard a sound that he recognized as loose bullets. The First Circuit's opinion in *Jimenez* provides

---

**18.** The First Circuit's opinion in *United States v. Paneto* is not to the contrary. There, an officer marked a $20 bill before engaging in a controlled buy; later, in the apartment of the suspected dealer, he observed a similar bill, with a similar marking, and lifted it to confirm that it was the same one. *See* 661 F.3d 709, 713 (1st Cir. 2011). The First Circuit held that under *Hicks*, lifting an object to magnify what was already visible to the naked eye was permissible. *Id.* at 718 n.13 ("[T]he Fourth Amendment forbids handling an item to expose something hidden, but it is far from clear that the Fourth Amendment prohibits moving an item merely to magnify or confirm something already visible."). Agent Torres did not lift the fannypack to confirm anything he could see from a lawful vantage point, and so *Paneto* does not control.

that even if the sound Agent Torres heard convinced him that bullets were in the fannypack, a warrantless search of the fannypack was still unjustified. *Jimenez*, 419 F.3d at 40. And even if the First Circuit did permit "plain sound" searches, I would not find that the origin of the sound Agent Torres heard was so obvious as to meet the demanding "virtual certainty" standard, and the search would still be precluded.

Indeed, were an agent to apply for a warrant before me, based solely on what he believed to be the sound of bullets rattling in a package, I would be hard pressed even to find probable cause: there is nothing so particular about the sound of clanking bullets—rather than coins, or batteries—that would let me confidently say that the agent had correctly identified the noise's source.[19]   Accordingly, even seizure of the

---

**19.** My point is that smell and touch, like sight, can in certain cases give rise to such distinct perceptions that their source cannot be doubted. Indeed, these senses can at times be more valuable than sight. *See, e.g.,* 2 SEARCH & SEIZURE § 3.6(b) ("As the illegal substance cases illustrate, the sense of smell will often make a more certain finding of probable cause than the sense of sight."). The same might sometimes be true of sound, such as where the container holds an item that makes a truly distinct noise—distinct in the way that the smell of marijuana or the shape of a gun is obvious to someone with experience. But here, Agent Torres heard a metal clanking that is not believably distinct enough, without more, to give even an experienced listener more than a hunch

fannypack would have been inappropriate. *See Jimenez*, 419 F.3d at 40 (holding that where law enforcement perceives a container's contents based on a sense other than sight, seizure—but not search—is appropriate); *see also United States v. Davis*, 690 F.3d 226, 267 (4th Cir. 2012) ("Of course, even if Detective King could conceivably, on some theory, lawfully seize the bag, that does not mean that he could inspect its contents, i.e., search the bag, without obtaining Davis's consent or a judicial warrant.").

Finally, even if the sound of the bullets justified Agent Torres's entry into the fannypack, his justification for searching ended when he found the box of ammunition. That is, if the search were justified on a plain view theory, and the thing that had been in "plain view" were the bullets, then once those items had been recovered, the justification for the search ended because nothing else was in plain view. *Cupp v. Murphy*, 412 U.S. 291, 295 (1973) ("[T]he scope of a warrantless search must be commensurate with the rationale that excepts the search

---

as to its source. Agent Torres's claim to have been confident in the knowledge the fannypack held bullets—to say nothing of being confident enough to invoke the plain view doctrine—simply beggars belief.

from the warrant requirement."); *cf. Terry v. Ohio*, 392 U.S. 1, 19–20 (1968) (explaining that whether an officer's actions were "reasonably related in scope to the circumstances which justified the interference in the first place" is crucial to "determining whether [a] search and seizure" was reasonable). But after recovering the bullets, Agent Torres went further: he opened a *second* zipper on the fannypack and found a gun, even though the gun's existence had not previously been perceived by any of his senses. No exception to the warrant requirement justified the opening of the second zipper, and so a warrant was required. For these reasons, the search of the fannypack that produced the firearm was not justified by a plain-view extension of the clothing exception.

### 2.4 The exclusionary rule requires the suppression of the firearm and Arroyo's statements.

Given that the discovery of the firearm was the direct result of an illegal search, the exclusionary rule bars its use at trial. *New York v. Harris*, 495 U.S. 14, 19 (1990) (holding that evidence should be suppressed if it "bear[s] a sufficiently close relationship to the underlying illegality");[20] *see also Segura v. United*

---

**20.** The exclusionary rule does not apply where "the connection between the illegal police conduct and the discovery and seizure of the evidence

*States*, 468 U.S. 796, 804 (1984) ("Evidence obtained as a direct result of an unconstitutional search or seizure is plainly subject to exclusion."). Likewise, any statements made by Arroyo regarding the firearm are suppressible because they, too, were an unattenuated consequence of the illegal search: had no gun been found, Arroyo certainly would have made no statement regarding it because the police would have had no cause to ask. *United States v. Budzyna*, 666 F.2d 666, 671 (1st Cir. 1981) (suppressing statements as "fruits of an illegal search and seizure"); *cf. Brown v. Illinois*, 422 U.S. 590, 604–05 (explaining the attenuation doctrine and suppressing statements that were closely related, both temporally and logically, to the defendant's illegal arrest).

Neither can the gun's discovery be said to have been inevitable. The inevitable discovery doctrine provides that "evidence obtained by violating the Fourth Amendment is

---

is 'so attenuated as to dissipate the taint'" of the illegality. *Segura v. United States*, 468 U.S. 796, 805 (1984) (quoting *Nardone v. United States*, 308 U.S. 338, 341 (1939)). Proving attenuation is the Government's burden, *Brown v. Illinois*, 422 U.S. 590, 603–04 (1975), and here the Government has made no attempt to show it. Nor could it, given that the firearm's discovery was directly and solely caused by the illegal search.

nonetheless admissible '[i]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means.'" *United States v. D'Andrea*, 648 F.3d 1, 12 (1st Cir. 2011) (quoting *Nix v. Williams*, 467 U.S. 431, 444 (1984)). The alternative method of discovery must be independent, and a court must find that it "would necessarily have been employed" and that it would have "in fact" discovered the evidence. *United States v. Crespo-Rios*, 645 F.3d 27, 42 (1st Cir. 2011); *see also United States v. Heath*, 455 F.3d 52, 58–59 (2d Cir. 2006) ("We have previously indicated that the government cannot prevail under the inevitable discovery doctrine merely by establishing that it is more probable than not that the disputed evidence would have been obtained without the constitutional violation."). In this case, consent or a warrant were the agents' only other legal options for opening the fannypack. It is possible that either Arroyo or Negrón might have consented to a search of the dresser in this case, but that does not make discovery inevitable. Indeed, consent is by its nature too speculative a source of information to support admission on an inevitable discovery theory. *Cf. United States v. Felix*, 134 F. Supp. 2d 162, 175 (D. Mass. 2001) ("As a general matter, a consent search itself can

hardly be deemed inevitable given the consenting party's power to revoke her consent at any time.").

That leaves a warrant, but it is undisputed that the agents at no time sought—and thus did not receive—a warrant to search Negrón's home or anything within it. In fact, I have found that no probable cause for a search even existed, and so a warrant could not have issued. But if probable cause *had* existed, the failure to *actually seek* a warrant would be fatal to the doctrine's applicability here. In the First Circuit's foundational inevitable discovery case, *United States v. Silvestri*, the court considered whether discovery could be said to be inevitable where, apart from the illegality, there was probable cause to perform the search. 787 F.2d 736 (1st Cir. 1986). The court explained that

> [p]hrased as a fourth amendment argument, the application of the inevitable discovery rule where no warrant is in fact obtained would substitute proof by a preponderance of the evidence that a warrant could and would have been obtained for the requirement of the fourth amendment that a warrant must in fact be obtained through a neutral and detached magistrate prior to a search. Such an approach substantially weakens the protection provided by the fourth amendment.

*Id.* at 744–45. Thus, the court suggested that "in illegal search cases where no warrant is ever obtained," a rule requiring that the "active pursuit" of a warrant "be underway" at the time of the illegal search may be appropriate. *Id.* at 746. Where, as here, no warrant is pursued, however, *Silvestri* strongly implies that a *post hoc* finding of probable cause cannot save the illegally discovered evidence from exclusion. In a similar case, Judge Gertner of the District of Massachusetts put it like this:

> [A]n officer cannot justify a warrantless search on the ground that she *could* have obtained a warrant—she had the requisite probable cause and the time to obtain one—but she did not take any steps to do so. If a warrantless search were justified on this ground, the warrant requirement would be eviscerated wherever probable cause exists. However likely it is that a magistrate would issue a warrant, the police lack the authority to cross the threshold of a citizens home without authorization (other than in exceptional circumstances).

*Felix*, 134 F. Supp. 2d at 175; *see also United States v. Griffin*, 502 F.2d 959, 961 (6th Cir. 1974) (similar); *United States v. Torres*, 274 F. Supp. 2d 146, 162 (D.R.I. 2003) (similar).[21] Judge Gertner is

---

**21.** The Second Circuit has formulated the rule somewhat differently, though to similar effect. In that jurisdiction, "the inevitable discovery exception to the exclusionary rule" applies "only where a court can find, with a high level of confidence, that each of the contingencies

plainly correct on this point: to forgive warrantless searches where a warrant could have been—*but was not*—sought would moot the warrant requirement and destroy the distinction that the Supreme Court has drawn between vehicles—where warrantless searches on probable cause are permissible—and homes—where they are not.

The discovery of the gun was not inevitable, and so the exclusionary rule must apply to both its discovery and the statements Arroyo subsequently made to law enforcement.

### 3.  Conclusion

For the reasons explained above, I find that Agent Torres discovered the gun after a warrantless search that was justified

---

necessary to the legal discovery of the contested evidence would be resolved in the government's favor." *United States v. Heath*, 455 F.3d 52, 60 (2d Cir. 2006). In the warrantless-search context, that requires a showing not just "that a judge *could* validly have issued a warrant," but that she "*would* have issued the warrant"—and that the agents would actually have sought it. *Id.* at 58–59. In this case, I do not believe probable cause to have existed, but if it did, it was not a strong showing. Thus, the Government could not prove that a warrant *would have* issued, even if it *could have. Cf. United States v. Cabassa*, 62 F.3d 470, 472–73 (2d Cir. 1995) (rejecting application of the exception where probable cause showing was light, and so there was a "possibility that a magistrate would have required a stronger showing of probable cause"). Therefore, discovery would not be inevitable in this case under the Second Circuit's rule either.

by no exception to the Fourth Amendment's warrant require-ment. Furthermore, the evidence sought to be suppressed was the direct result of the illegal search, and the inevitable discovery rule does not apply. Accordingly, I recommend that Arroyo's motion to suppress, Docket No. 15, be GRANTED.

IT IS SO RECOMMENDED.

The parties have fourteen days to file any objections to this report and recommendation. Failure to file the same within the specified time waives the right to appeal this report and recommendation. *Henley Drilling Co. v. McGee*, 36 F.3d 143, 150-51 (1st Cir. 1994); *United States v. Valencia-Copete*, 792 F.2d 4 (1st Cir. 1986).

In San Juan, Puerto Rico, this 5th day of May, 2015.

S/ SILVIA CARREÑO-COLL

UNITED STATES MAGISTRATE JUDGE