## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

**UNITED STATES OF AMERICA**
Plaintiff

v.                                                  **Criminal No. 15-083 (DRD)**

**Hector Arroyo-Medina**
Defendant

### OPINION & ORDER

Hector Arroyo-Medina (hereinafter "Defendant") was previously convicted of a crime punishable by a term of imprisonment exceeding one year. As such, he is prohibited from knowingly possessing any firearm or ammunition in and affecting interstate commerce. Notwithstanding, on the early morning hours of January 27, 2015, a team of police officers found Defendant's loaded handgun and ammunition in a fanny pack inside a dresser in his girlfriend's house. Defendant was arrested and the corresponding federal charges were levied by way of a one-count indictment. See Docket No. 9; 18 U.S.C. §§ 921(a)(3), 921(a)(17)(A), 922(g)(1), and 924(a)(2). However, these items were discovered by way of a warrantless search.

Not surprisingly, Defendant now moves to suppress his handgun, ammunition, and subsequent incriminatory statements to the police as to the ownership of these items. Docket No. 15. Specifically, Defendant contends that the general rule is that warrantless searches are per se illegal and that the circumstances of this case do not fit into any recognized exception. Docket Nos. 15, 39, 45, and 62. In contrast, the Government claims that the challenged search occurred incident to the arrest, which is a well-established exception to the warrant requirement. Docket No. 24, 35, 45, and 59.

The Court referred the instant motion to Magistrate Judge Silvia Carreño-Coll for a report and recommendation.  Docket No. 17.

## I.    REFERRAL TO MAGISTRATE JUDGE

The Court may refer motions to suppress to a United States Magistrate Judge for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).  See Fed. R. Civ. P. 72(b); see also Local Rule 72(a); Matthews v. Weber, 423 U.S. 261 (1976).   An adversely affected party may contest the Magistrate's report and recommendation by filing its objections. Fed. R. Civ. P. 72(b).  Moreover, 28 U.S.C. § 636(b)(1), in pertinent part, reads as follows:

> . . . any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court.  A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made.  A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate.

"Absent objection, . . . [a] district court ha[s] a right to assume that [the affected party] agree[s] to the magistrate's recommendation."   Templeman v. Chris Craft Corp., 770 F.2d 245, 247 (1st Cir. 1985), cert denied, 474 U.S. 1021 (1985).   Additionally, "failure to raise objections to the Report and Recommendation waives that party's right to review in the district court and those claims not preserved by such objections are precluded upon appeal."  Davet v. Maccarone, 973 F.2d 22, 30-31 (1st Cir. 1992); see Henley Drilling Co. v. McGee, 36 F.3d 143, 150-51 (1st Cir. 1994) (holding that objections are required when challenging findings actually set out in a magistrate's recommendation, as well as the magistrate's failure to make additional findings;  see also Lewry v. Town of Standish, 984 F.2d 25, 27 (1st Cir. 1993) (stating that "[o]bjection to a magistrate's report preserves only those objections that are specified"); Borden v.

Sec. of H.H.S., 836 F.2d 4, 6 (1st Cir. 1987) (holding that appellant was entitled to a de novo review, "however he was not entitled to a de novo review of an argument never raised").

The Court, in order to accept unopposed portions of the Magistrate Judge's *Report and Recommendation*, need only satisfy itself that there is no "plain error" on the face of the record. See Douglass v. United Servs. Auto, Ass'n, 79 F.3d 1415, 1419 (5th Cir. 1996) (*en banc*) (extending the deferential "plain error" standard of review to the un-objected to legal conclusions of a magistrate judge); see also Nettles v. Wainwright, 677 F.2d 404, 410 (5th Cir. 1982) (en banc) (appeal from district court's acceptance of un-objected to findings of magistrate judge reviewed for "plain error"); see also Nogueras-Cartagena v. United States, 172 F.Supp. 2d 296, 305 (D.P.R. 2001) (finding that the "Court reviews [unopposed] Magistrate's Report and Recommendation to ascertain whether or not the Magistrate's recommendation was clearly erroneous") (adopting the Advisory Committee note regarding Fed.R.Civ.P. 72(b)); see also Garcia v. I.N.S., 733 F.Supp. 1554, 1555 (M.D.Pa. 1990) (finding that "when no objections are filed, the district court need only review the record for plain error").

Thus, the Court shall conduct de novo review of the objected portions of the report and recommendation while using the aforementioned "plain error" standard for the portions that have not been objected to.

## II.   THE MAGISTRATE JUDGE'S FINDINGS

After presiding over a two-day evidentiary hearing, the Hon. Silvia Carreño-Coll issued a lengthy and thorough report and recommendation granting Defendant's motion

to suppress.  In coming to such a determination, the Magistrate Judge made certain findings of fact and conclusions of law.  An overview of these findings is set forth below.

### A. The Magistrate's Findings of Fact

In January of 2015, there was a local warrant out for Defendant's arrest for violations of Puerto Rico's domestic violence act stemming from an incident where he threatened his girlfriend with a knife.  Docket No. 31, p. 3.  Notwithstanding this warrant for arrest, no corresponding search warrant was ever issued against Defendant.  Id. at 38.  In light of the pending arrest warrant, a team of police officers were actively preparing to arrest Defendant.  Id. at 3.  Due to the nature of the charges, this team of police officers presumed that Defendant was armed and had a violent temperament.  Id. However, the officers also knew—because of the information included on the work plan that they were provided—that Defendant was a small man of short stature, specifically with a height of 5'3" and a weight of 134 pounds.  Id. at 17 n. 10.

An investigation led the team to discover that Defendant would be at his girlfriend's apartment on the morning of January 27, 2015.[1]  Accordingly, at about 5:30 a.m. on January 27, 2015, five police officers pounded on the door of the girlfriend's apartment.[2]  Id. at 3.  As nobody answered the door, the officers were forced to break it down.  Id. at 4.  Upon entering, the officers secured the living room before going down a hallway.  Id.  The five officers first arrived at a bathroom where they found Defendant's girlfriend who was unclothed.  Id.  One of the female police officers remained in the

---

[1] Curiously, the domestic violence charges were for Defendant threatening this same girlfriend with a knife.  In fact, it was the girlfriend who filed the complaint against Defendant.  Notwithstanding, the couple testified that their differences were resolved shortly after the incident.  However, the charges were apparently never dropped.

[2] For ease of read, the Court uses the "police officer" label.  However, to be precise, three of the five officers are part of the task force of the U.S. Marshals.  Despite the involvement of these federal officers, there were no federal charges pending against Defendant at that time.

bathroom with the girlfriend while the other four continued down the hallway.  Id.  Two of the remaining four officers entered another room, which eventually turned out to be empty.  See Id.  The remaining two officers—Officers Roberto Torres-Rivera ("Agent Torres") and Salvador Nuñez-Zayas ("Agent Nuñez")—came to a locked door down the hall.

After threatening to break down the door, it was opened by Defendant who was dressed in only his underwear.  Id.  Defendant was quickly placed on a bed inside the room and handcuffed with his hands behind his back.  Id. at 4-5.  During this time, both officers were in the room with Defendant.  Id. at 16.  The Magistrate also made a point that both of these officers were much larger than Defendant who, as previously alluded to, was thin and of short stature.  Id.  As Defendant likely did not want to be taken out of the apartment dressed in only his underwear, the Magistrate determined that Defendant "at least . . . acquiesced" to the search for his clothes.  Id. at 5.  Accordingly, Defendant indicated to Officer Torres in the direction of the corner of the room, which is where he had clothes on the floor.  Id. at 5-7.  However, there was also a dresser in this corner of the room.  Id.  As a result of Defendant's gesture to this area, Agent Torres opened one of the dresser's drawers, which contained a black fanny pack on top of some women's clothes.  Id. at 6 n. 7 and 7.

Upon seeing the fanny pack, Agent Torres immediately picked it up.  Id. at 7.  The act of picking it up caused a sound to be heard from the inside of the fanny pack.  Id.  Based on Agent Torres' experience, he believed that the sound coming from the fanny pack was the sound of bullets.  Id.  Thus, he proceeded to unzip one of the zippers on the fanny pack and found a box of bullets inside.  Id.  This led Agent Torres

to unzip a second zipper on the fanny pack, which concealed a loaded handgun.  Id.
Both the handgun and ammunition were seized.  Id.  Next, Defendant was provided with
his pants and then removed from the apartment.  Id.  Subsequently, Defendant made
incriminatory statements to the police regarding the seized items.  Id. at 8.

### B.  The Magistrate's Conclusions of Law

Once the presentation of evidence culminated, the parties argued their positions
to the Magistrate Judge.  Specifically, the Government argued that this search occurred
incident to the arrest, which is a type of search that does not require a warrant.
Defendant countered by stating that the Government has not established any exception
to the warrant requirement applicable to this case.

In addition to considering the Government's lone argument, the Magistrate Judge
went to considerable lengths to consider many other possible exceptions to the warrant
requirement that may apply to the case at bar.  Nevertheless, the Magistrate Judge
concluded that none of these exceptions are warranted on the facts of the case.  The
Court shall identify each of these arguments and the Magistrate's reasons for denying
them.  However, "where, as here, a [Magistrate] has produced a first-rate work product,
a reviewing tribunal should hesitate to wax longiloquence simply to hear its own words
resonate."  In re San Juan Dupont Plaza Hotel Fire Litig., 989 F. 2d 36, 38 (1st Cir.
1993); see Vega-Morales v. Commissioner of Social Security, 380 F. Supp. 2d 54, 60
(D.P.R. 2005) (quoting Lawton v. State Mut. Life Assu. Co. of Am., 101 F. 3d 218, 220
(1st Cir. 1996)).  Thus, as the Magistrate's analysis is already in-depth and precise, the

Court prefers to use selected passages of the report and recommendation instead of paraphrasing what is already a "first-rate work product."[3]

Although it was not argued by the Government, the Magistrate Judge considered and rejected the "protective sweep" doctrine with spot-on case law:

> Warrantless searches of homes are "presumptively unreasonable." *United States v. Tibolt*, 72 F.3d 965, 968 (1st Cir. 1998). There are, of course, exceptions, among them the "protective sweep" . . . [doctrine]. *See . . . Maryland v. Buie*, 494 U.S. 325, 336 (1990) (articulating the "protective sweep" doctrine). *Buie* permits the "cursory visual inspection of those places in which a person might be hiding." 494 U.S. at 327; *see also United States v. Nascimento*, 491 F.3d 25, 49 (1st Cir. 2007) (explaining that protective sweeps are justified "by the potential threat posed by unseen third parties who may be lurking on the premises"). Of course, a person could not have been hiding in the small dresser, much less in the fannypack. As such, the discovery of the gun was not justified by the protective sweep doctrine. *Nascimento*, 491 F.3d at 50 (finding *Buie* inapplicable where "the cabinet searched was too small to accommodate a person").  (emphasis in original).

Id. at 9.

The Magistrate Judge next turned to the "search incident to arrest" doctrine, which, as previously alluded to, was the lone argument relied upon by the Government at the culmination of the suppression hearing.  At the outset, the Magistrate Judge adequately explains the leading case on the matter: Chimel v. California, 395 U.S. 752, 763 (1969).  The Magistrate explained that, during an arrest, an officer may effectuate a warrantless search "within the arrestee's 'immediate control,' meaning 'the area from within which he might gain possession of a weapon or destructible evidence.'"  Docket No. 31, p. 11 (citing Chimel, 395 U.S. at 763).  Additionally, the Magistrate elucidated that "officer safety" and "protection of evidence" are "*Chimel*'s rationales."  Id. at 13

---

[3] With that being said, however, the Court complements the analysis in a subsequent subsection of this opinion and order.

(citing <u>Arizona v. Gant</u>, 556 U.S. 332, 343 (2009)).  When applying this legal framework

to the instant fact pattern, the Magistrate Judge stated the following:

> In this case, at the time Agent Torres opened the dresser, there was no realistic possibility that [Defendant] could reach the gun subsequently found inside the fannypack. [Defendant] was secured—handcuffed, with Agent Nuñez hovering over him—and the gun was in a closed container inside another closed container. The inside of the fannypack was thus not in [Defendant's] "immediate control," and so no search was permissible.
>
> Even before *Gant*, Judge Posner made a similar point in *United States v. Tejada*. In that case, the defendant was arrested in his "tiny" apartment; in the course of his arrest, he reached for a gun in his waistband. *See* 524 F.3d 809, 811–12 (7th Cir. 2008). After the defendant was arrested and cuffed behind his back, the agents opened a cabinet in an entertainment center, as well as a blue bag in the cabinet closed with a zipper (and then yet another bag, in which they found cocaine). *See id.* Though it was "unlikely" that the defendant would have been able to lunge for a weapon in the cabinet, the court concluded that the police were nonetheless justified in opening it: it was only "a few steps" away from the defendant, and the cops "did not know how strong [the defendant] was, and he seemed desperate." *Id.* at 812. But, Judge Posner wrote, while it was "conceivable" that the defendant could have reached the cabinet, "it [was] inconceivable that having opened the cabinet door he would have had time to unzip the travel bag without being wrestled to the floor" by the police. *Id.* The same logic applies here: it is unlikely, but not impossible, that [Defendant] could have reached the dresser; it is inconceivable that he could have reached the dresser, opened the drawer, removed the fannypack, and then unzipped the correct zipper of the bag and removed the gun all before being subdued by the two agents in the room with him. A contrary ruling in this case—a holding that after securing and arresting a room's occupant, the police may search not only cabinets, dressers, and closets, but the closed containers within them—would turn the narrow *Gant/Chimel* exception into permission to perform a general search. *Cf. United States v. Irizarry*, 673 F.2d 554, 559 n.* (1st Cir. 1982) (warning against a holding that would "allow warrantless searches of unlimited scope" on the basis of "any plausible or implausible sequence of events [that] might link a defendant with a gun's potential hiding place").
>
> At the time the agents searched the dresser, the gun inside the fannypack was well beyond [Defendant's] reaching distance and outside of his immediate control. *See Gant*, 556 U.S. at 343.  I conclude that *Chimel* did not permit the search of the fannypack.  (emphasis in original; footnotes omitted).

<u>Id.</u> at 16-19.

Next, Magistrate Judge Carreño-Coll turned to two other arguments not pursued by the Government: exigent circumstances and consent.[4]  Although consideration of these arguments does not result in a finding that the warrantless search of the fanny pack was legal, the Magistrate opined that they do provide the Government with justification for opening the dresser drawer.  Pertaining to the exigent circumstances argument, the report and recommendation reads as follows:

> Despite the general prohibition on warrantless searches, they may be permitted, under certain circumstances, upon the existence of exigent circumstances. *United States v. Samboy*, 433 F.3d 154, 158 (1st Cir. 2005).  "The Government bears the burden of proving exigent circumstances." *Id.* The First Circuit has suggested that upon arresting an undressed person, "the need to dress him may constitute an exigency justifying the officers in entering another room in order to obtain needed clothing." *Nascimento*, 491 F.3d at 50 (citing *United States v. Gwinn*, 219 F.3d 326, 333 (4th Cir. 2000)). *But see United States v. Kinney*, 638 F.2d 941, 945 (6th Cir. 1981) ("The defendant did not request permission to secure additional clothing and did not consent to an entry of his home. Entry cannot be justified on these grounds.").
>
> In *Nascimento*, the First Circuit was not explicit about the standard by which a court should judge an exigency of this sort. *See id.* ("Generalizations are hazardous because one can imagine infinitely variable fact patterns."). It did note that in that case, the cool climate of the place of arrest—Massachusetts in December—supported a finding of exigency. *Id.; see also Gwinn*, 219 F.3d at 333 (referring to the "increasing chill during the evening hours of an early May day" in West Virginia); *United States v. Titus*, 445 F.2d 577, 579 (2d Cir. 1971) (Friendly, J.) (noting that the decision to clothe the prisoner was made "on a December night" in New York). Here in Puerto Rico, of course, concerns about chills don't get the Government very far. And neither did the Government suggest any other reason for dressing [Defendant], at least in terms of his safety. But *Nascimento* suggests an additional, broader rationale: "human dignity." *Nascimento*, 491 F.3d at 50. This suggests that police may generally require an undressed arrestee to put on clothes before being removed from the place of arrest. *Cf. United States v. Di Stefano*, 555 F.2d 1094, 1101 (2d Cir. 1977) (holding that "officers had a *duty* to find clothing for [the defendant] to wear or to permit her to do so"); see also 3 SEARCH & SEIZURE § 6.4(a) ("Assuming a lawful arrest at the defendant's residence, it does not seem at all unreasonable for the police

---

[4] The Court notes, however, that the Government eventually alludes to consent in the subsequent filings after the Magistrate's report and recommendation.

to require the defendant to don street clothing, without regard to his wishes."). Given the breadth of the First Circuit's holding in this regard, then, I will assume that the agents were entitled to conduct a search reasonably aimed at finding [Defendant's] clothes.

*Nascimento* refers specifically to the authority to enter a room to look for clothing. Logic suggests, however, that where an exigency permits entry into a room, it would also permit entry into a container—like a dresser—the officer reasonably believes will contain clothing. *Cf. United States v. Rudaj*, 390 F. Supp. 2d 395, 405 (S.D.N.Y. 2005) (holding that because police have "no more leeway to invade the privacy unnecessarily of an insufficiently dressed arrestee than they have with the fully dressed," the clothing exception permits only a narrow class of searches), *aff'd sub nom., United States v. Ivezaj*, 568 F.3d 88 (2d Cir. 2009). Here, I find that the agents were justified in opening the dresser drawer. As noted previously, [Defendant] gestured to the general area where the dresser sat. Though he was in fact gesturing to his clothes on [the] ground, the record does not suggest that he specifically told the agents to give him the shorts that were outside of the dresser, nor did he specifically tell the agents not to open the dresser. Agent Torres was thus justified in opening the dresser—an obvious place to find clothes—in order to look for something for [Defendant] to put on.  (emphasis in original; footnotes omitted).

Id. at 19-22.

Moving on, with respect to the "consent" argument, the Magistrate expressed the

following views:

In a sense [Defendant] can be said to have consented to the opening of the dresser. *See United States v. Winston*, 444 F.3d 115, 117, 121 (1st Cir. 2006) (finding consent to search a nightstand where, asked for the location of his wallet, the defendant "pointed to the nightstand with his shoulder," despite the fact that "the agents did not explicitly ask for permission to open the drawer to retrieve [the defendant's] identification"). This amounts to an alternative justification for the agents' opening of the dresser drawer. **However, that consent was for the specific purpose of retrieving clothes and would not have extended to the removal or opening of the fannypack.** *United States v. Marshall*, 348 F.3d 281, 286 (1st Cir. 2003) ("Warrantless searches may not exceed the scope of the consent given.").  (emphasis provided by the subscribing District Judge).

Id. at 22-23 n. 14.

Although the Magistrate deems the warrantless opening of the dresser drawer to be reasonable, that does not end the Government's burden in this case.   Thus, the Magistrate Judge next turns to whether the "plain perception" doctrine would allow the warrantless search of the fanny pack and the seizure of its contents.[5]   The extensive analysis is set forth below:

> In *Coolidge v. New Hampshire*, a plurality of the Supreme Court explained that the plain view doctrine applies where law enforcement, having legally reached their vantage point, comes "inadvertently across a piece of evidence incriminating the accused." 403 U.S. 443, 466 (1971) (plurality opinion); *see also Texas v. Brown*, 460 U.S. 730, 738–39 (1983) (plurality opinion) (explaining that the doctrine is "better understood" as "an extension of whatever the prior justification for an officer's access to an object" is, rather than as "an independent exception to the warrant" requirement (internal quotations omitted)). In such circumstances, warrantless seizure of the evidence is permissible if its incriminatory nature is "immediately apparent." *Id.* In *Horton v. California*, the Supreme Court formulated *Coolidge's* holding into a three-part test: first, the officer must legally "arriv[e] at the place from which the evidence could be plainly viewed"; second, the evidence must be "in plain view" and its incriminating nature must be "immediately apparent"; and third, the officer must "have a lawful right of access to the object itself." 496 U.S. at 136–37; *see also United States v. Paneto*, 661 F.3d 709, 713 (1st Cir. 2011) (elucidating a similarly-worded test). Applying these principles, courts have routinely permitted the seizure of incriminating evidence seen in plain view during clothing searches (consensual or otherwise). *See, e.g., Winston*, 444 F.3d at 117 (cash found in nightstand); *United States v. Butler*, 980 F.2d 619, 620–21 (10th Cir. 1992) (shotgun found in bedroom); *Rudaj*, 390 F. Supp. 2d at 406 (shotgun found in closet).
>
> Here, though, the firearm was not in plain view when Agent Torres opened the dresser drawer. Rather, from that vantage point, Agent Torres could see only the fannypack atop women's underwear. Indeed, before finding the gun Agent Torres had to pick the fannypack up, manipulate it, hear a sound, decide that sound was loose bullets, open one of the fannypack's zippers, find a box of bullets, and then open the fannypack's *other* zipper. Whether opening the fannypack was allowed, then, turns on whether the plain view doctrine allows the manipulation and opening of a closed container.

---

[5] Throughout this opinion and order the Court refers to the "plain view" doctrine by a more encompassing term: "plain perception."   The Court is not alone in using this umbrella term.   See § 679 Search Warrant Exceptions—Plain Perception, 3A Fed. Prac. & Proc. Crim. § 679 (4th ed.).   The use of this terminology is more appropriate in light of the extension of "plain view" to other senses such as smell and touch. Id.

To begin with, it is necessary to distinguish between searches and seizures. As a general matter, when police have plain view of a container that, on probable cause, they believe to contain contraband or evidence, they may seize it. *Arizona v. Hicks*, 480 U.S. 321, 326–27 (1987); *see also Brown*, 480 U.S. at 742–43 (plurality opinion) (permitting the warrantless seizure of a balloon that the police had probable cause to believe held cocaine). They may not, however, search the container without first obtaining judicial authorization. *Brown*, 480 U.S. at 747 (Stevens, J., concurring) ("[A] closed container may not be opened without a warrant, even when the container is in plain view and the officer has probable cause to believe contraband is concealed within." (citing *United States v. Chadwick*, 433 U.S. 1 (1977)); *United States v. Ross*, 456 U.S. 798, 812, 824 (1982) (referring to the "general principle that closed packages and containers may not be searched without a warrant," but finding an exception in the automobile context); *United States v. Doe*, 61 F.3d 107, 111 (1st Cir. 1995) ("Although probable cause, as well as exigent circumstances, may support the warrantless *seizure* of an enclosed opaque container, the *same* [probable-cause] showing is not necessarily sufficient to justify its subsequent warrantless *search*.").

An exception to this general prohibition on warrantless searches exists in certain circumstances. For example, if the container is "one of those rare single-purpose containers which 'by their very nature cannot support any reasonable expectation of privacy because their contents can be inferred from their outward appearance,'" a search is admissible under the plain view doctrine. *Brown*, 460 U.S. at 750–51 (Stevens, J., concurring) (quoting *Arkansas v. Sanders*, 442 U.S. 753, 764 n.13 (1979)); *see also Sanders*, 442 U.S. at 764 n.13 (referring to "a kit of burglar tools or a gun case"); *United States v. Meada*, 408 F.3d 14, 23 (1st Cir. 2005) (discussing the plain view doctrine in the context of a gun case). Similarly, "in some cases"—such as where the container is open or transparent—"the contents of a package will be open to 'plain view,' thereby obviating the need for a warrant." *Sanders*, 442 U.S. at 764 n.13. And finally, some cases have suggested that where senses other than sight—like smell, in the case of marijuana, or touch, in the case of malleable bag—make a container's contents obvious, search may be appropriate on a "plain sense" theory. *See, e.g., United States v. Williams*, 822 F.2d 1174, 1185 (D.C. Cir. 1987) (permitting search where "sensory information acquired by the officer" regarding the container's contents "rises to a state of certitude"); see also 3 SEARCH & SEIZURE § 5.5(f) nn. 191–98 & surrounding text (collecting "plain touch" and "plain smell" cases). However, such a justification for a search would seem to be precluded by First Circuit precedent. *See United States v. Jimenez*, 419 F.3d 34, 40 (1st Cir. 2005) (**"Where the odor of a forbidden substance is identified by someone found qualified to know the odor, there may well be probable cause to justify the issuance of a search warrant,**

**but it is not sufficient to justify a warrantless search."** (citations omitted)).

Here, Agent Torres saw the fannypack and he immediately picked it up. Notably, he did not testify that he picked it up so as to get at the clothes underneath. To the contrary, based on his testimony, it appears that he picked it up for the purposes of examining it. Indeed, in going through a dresser drawer to find clothes, one would not normally lift and manipulate an item placed on top; one would move it to the side and pick up the clothes underneath. It is probable, then, that Agent Torres's initial manipulation of the bag—his picking it up and moving it so that he could hear what was inside—was itself a violation of the Fourth Amendment.

In *Hicks*, the Supreme Court held that when an officer slightly moved a piece of stereo equipment in plain view so as to see the equipment's serial number, that officer performed a search. 480 U.S. at 324–25. Further, because the officer in *Hicks* did not have a search warrant, and because his "lawful objective" in the apartment was to search for a "shooter, victims, and weapons," the search of the stereo violated the Fourth Amendment because it was "separate and apart from" the officer's lawful purpose for being there. *Id.*; *see also id.* at 325 ("But taking action, unrelated to the objectives of the authorized intrusion, which exposed to view concealed portions of the apartment or its contents, did produce a new invasion of respondent's privacy unjustified by the exigent circumstances that validated the entry."). Nothing in Agent Torres's testimony indicated that his decision to pick the fannypack up and examine it was related to his "lawful objective" in opening the drawer, which objective was to find [Defendant's] clothes. Accordingly, *Hicks* suggests that the examination of the fannypack itself violated the Fourth Amendment, and so anything flowing from that manipulation—the sound, the bullets, the gun—would be the fruit of that violation.

More to the point, even if Agent Torres had a legal justification for manipulating the fannypack—and thus for hearing the sound he believed to be bullets—at best, that fact would have given him probable cause to *seize* the fannypack. In no case could he have *searched* it. Agent Torres testified that when he manipulated the bag, he heard a sound that he recognized as loose bullets. **The First Circuit's opinion in *Jimenez* provides that even if the sound Agent Torres heard convinced him that bullets were in the fannypack, a warrantless search of the fannypack was still unjustified. *Jimenez*, 419 F.3d at 40. And even if the First Circuit did permit "plain sound" searches, I would not find that the origin of the sound Agent Torres heard was so obvious as to meet the demanding "virtual certainty" standard, and the search would still be precluded.**

Indeed, were an agent to apply for a warrant before me, based solely on what he believed to be the sound of bullets rattling in a package, I would be hard pressed even to find probable cause: there is nothing so particular about the sound of clanking bullets—rather than coins, or

batteries—that would let me confidently say that the agent had correctly identified the noise's source. Accordingly, even seizure of the fannypack would have been inappropriate. *See Jimenez*, 419 F.3d at 40 (holding that where law enforcement perceives a container's contents based on a sense other than sight, seizure—but not search—is appropriate); *see also United States v. Davis*, 690 F.3d 226, 267 (4th Cir. 2012) (**"Of course, even if Detective King could conceivably, on some theory, lawfully seize the bag, that does not mean that he could inspect its contents, i.e., search the bag, without obtaining Davis's consent or a judicial warrant."**). (emphasis in bold provided by the subscribing District Judge; emphasis in italics in original; footnotes omitted).

Id. at 23-32.

After concluding that the Agent Torres illegally searched Defendant's fanny pack without a warrant, the Magistrate turned to one final inquiry: whether each of the seized pieces of evidence—the handgun, the ammunition, and the incriminatory statements to the police—subject to the "exclusionary rule."  At the outset, the Magistrate noted the following:

The exclusionary rule does not apply where "the connection between the illegal police conduct and the discovery and seizure of the evidence is 'so attenuated as to dissipate the taint'" of the illegality. *Segura v. United States*, 468 U.S. 796, 805 (1984) (quoting *Nardone v. United States*, 308 U.S. 338, 341 (1939)). Proving attenuation is the Government's burden, *Brown v. Illinois*, 422 U.S. 590, 603–04 (1975), and here the Government has made no attempt to show it. Nor could it, given that the firearm's discovery was directly and solely caused by the illegal search.

Id. at 33-34 n. 20.  Next, the Magistrate Judge considered the "inevitable discovery" doctrine, which was also never presented by the Government.  In making and rejecting this argument, the Magistrate opined as follows:

Neither can the gun's discovery be said to have been inevitable. The inevitable discovery doctrine provides that "evidence obtained by violating the Fourth Amendment is nonetheless admissible '[i]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means.'"  *United States v. D'Andrea*, 648 F.3d 1, 12 (1st Cir. 2011) (quoting *Nix v. Williams*, 467 U.S. 431, 444 (1984)). The alternative

method of discovery must be independent, and a court must find that it "would necessarily have been employed" and that it would have "in fact" discovered the evidence. *United States v. Crespo-Rios*, 645 F.3d 27, 42 (1st Cir. 2011); *see also United States v. Heath*, 455 F.3d 52, 58–59 (2d Cir. 2006) ("We have previously indicated that the government cannot prevail under the inevitable discovery doctrine merely by establishing that it is more probable than not that the disputed evidence would have been obtained without the constitutional violation."). In this case, consent or a warrant were the agents' only other legal options for opening the fannypack. It is possible that either [Defendant] or [his girlfriend] might have consented to a search of the dresser in this case, but that does not make discovery inevitable. Indeed, consent is by its nature too speculative a source of information to support admission on an inevitable discovery theory. *Cf. United States v. Felix*, 134 F. Supp. 2d 162, 175 (D. Mass. 2001) ("As a general matter, a consent search itself can hardly be deemed inevitable given the consenting party's power to revoke her consent at any time.").

That leaves a warrant, but it is undisputed that the agents at no time sought—and thus did not receive—a warrant to search Negrón's home or anything within it. In fact, I have found that no probable cause for a search even existed, and so a warrant could not have issued. But if probable cause *had* existed, the failure to *actually seek* a warrant would be fatal to the doctrine's applicability here. In the First Circuit's foundational inevitable discovery case, *United States v. Silvestri*, the court considered whether discovery could be said to be inevitable where, apart from the illegality, there was probable cause to perform the search. 787 F.2d 736 (1st Cir. 1986). The court explained that

> [p]hrased as a fourth amendment argument, the application of the inevitable discovery rule where no warrant is in fact obtained would substitute proof by a preponderance of the evidence that a warrant could and would have been obtained for the requirement of the fourth amendment that a warrant must in fact be obtained through a neutral and detached magistrate prior to a search. Such an approach substantially weakens the protection provided by the fourth amendment.

*Id.* at 744–45. Thus, the court suggested that "in illegal search cases where no warrant is ever obtained," a rule requiring that the "active pursuit" of a warrant "be underway" at the time of the illegal search may be appropriate. *Id.* at 746. Where, as here, no warrant is pursued, however, *Silvestri* strongly implies that a post hoc finding of probable cause cannot save the illegally discovered evidence from exclusion. In a similar case, Judge Gertner of the District of Massachusetts [expressed the legal analysis as follows]:

> [A]n officer cannot justify a warrantless search on the ground that she *could* have obtained a warrant—she had the requisite probable cause and the time to obtain one—but she did not take any steps to

do so. If a warrantless search were justified on this ground, the warrant requirement would be eviscerated wherever probable cause exists. However likely it is that a magistrate would issue a warrant, the police lack the authority to cross the threshold of a citizens home without authorization (other than in exceptional circumstances).

*Felix*, 134 F. Supp. 2d at 175; *see also United States v. Griffin*, 502 F.2d 959, 961 (6th Cir. 1974) (similar); *United States v. Torres*, 274 F. Supp. 2d 146, 162 (D.R.I. 2003) (similar). Judge Gertner is plainly correct on this point: to forgive warrantless searches where a warrant could have been—*but was not*—sought would moot the warrant requirement and destroy the distinction that the Supreme Court has drawn between vehicles—where warrantless searches on probable cause are permissible—and homes—where they are not.

The discovery of the gun was not inevitable, and so the exclusionary rule must apply to both its discovery and the statements [Defendant] subsequently made to law enforcement.    (emphasis in original; footnotes omitted).

Id. at 34-38.

As the Magistrate Judge's report and recommendation is quite thorough, the Court shall proceed to summarize it in a few words.  First, the Magistrate finds that the inside of Defendant's fanny pack was illegally searched without a warrant.  Second, the Magistrate Judge finds that none of the exceptions that would allow a warrantless search apply to the instant fact pattern.  Specifically, the Magistrate finds that the "protective sweep" doctrine does not apply because a person does not fit inside a dresser or fanny pack.  See Nascimento, 491 F.3d at 50.  Moreover, that the "search incident to arrest," "exigent circumstances," and "consent" doctrines each allow Agent Torres to open the dresser drawer, but not unzip the two zippers of the fanny pack without a search warrant.  Finally, the Magistrate Judge finds that the "exclusionary rule" applies because the government has not argued otherwise, Agent Torres' conduct is *not* "so attenuated as to dissipate the taint" of the illegality, and the "inevitable discovery" doctrine does not apply.  See Segura, 468 U.S. at 805 (quoting Nardone, 308 U.S. at

341); Brown, 422 U.S. at 603–04. Dissatisfied with the Magistrate Judge's findings, the Government filed objections.

### III. THE GOVERNMENT'S OBJECTIONS

The Government's objections to the Magistrate's detailed report and recommendation are comparatively concise. The Court begins with the Government's objections to the Magistrate Judge's findings of fact. Many of these factual objections serve no purpose as they are either superfluous or were already found by the Magistrate in the Government's favor. What the Court is left with are the following general factual contentions: that Defendant was not necessarily cuffed behind his back, "that these events took place simultaneously in a matter of seconds," that the dresser was located steps from where Defendant was located at the time, that Agent Torres heard the noise from the fanny pack once he grabbed it, and that the officers did not have an investigative concern during the intervention. Docket No. 35, ¶¶ 17, 21, 22, and 23.

Moreover, the Government also objects to certain conclusions of law made by the Magistrate. First, the Government restates its contention that, in light of the totality of the circumstances, "the warrantless seizure of the firearm is justified" because it came about by a "search incident to arrest." See Docket No. 35, p. 2, ¶¶ 8, 26, 31, and 32. Second, that the search for Defendant's clothes "developed into a search incident to the defendant's arrest when the Officers found a fanny pack which, they understood, contained ammunitions and possibly a firearm." Id. at p. 5, ¶ 25. Armed with the Magistrate's report and recommendation and the Government's objections, the Court may begin its own analysis.

## IV.    LEGAL ANALYSIS

Despite the noteworthy report and recommendation issued by the Hon. Silvia Carreño-Coll, the Court decided to hold a de novo hearing in an attempt to clarify certain facts prior to rendering a ruling.  As a result of the evidence presented at said hearing, the Court adds certain factual findings that are of little, if any, consequence.

### A. Further Findings of Fact

The Court notes that the arrest warrant for Defendant was for violations of Puerto Rico's weapon's act in addition to the domestic violence act.  See Exhibit 1.  Also, the Court finds that, after she was found in the bathroom, Defendant's girlfriend began yelling comments at the officers and this continued throughout the intervention. Moreover, the Court believes Agent Torres that Defendant was handcuffed with his hands behind his back.  Additionally, after being handcuffed, Defendant was placed in a sitting position on the bed.  The Court also notes that both the room and the dresser were relatively small.  Furthermore, the Court confirms that Agents Torres and Nuñez are significantly larger in size than Defendant.

In addition, concerning the objections presented by the Government, the Court finds the following facts: the events that took place in Defendant's room occurred in a short period of time, the dresser was located steps from where Defendant was sitting on the bed at the time, Agent Torres heard the noise from the fanny pack once he grabbed it, and the officers did not have an investigative concern during the intervention.  All that remains, therefore, is for the Court to draw its legal conclusions from this resulting factual scenario.

**B. Conclusions of Law**

The Court opens this discussion by recognizing that Magistrate Judge Silvia Carreño-Coll's conclusions of law and their underlying analyses are substantiated by the facts and the applicable jurisprudence.  Moreover, even if the Magistrate had made the additional findings of fact discussed in the previous subsection, no conclusion of law would have changed.  Further, it is worth noting that—despite testimony to the contrary by three defense witnesses—the Magistrate's factual findings favor the Government's version of facts.  Yet, the Magistrate Judge still recommends that the motion to suppress be granted.  The Court agrees.

The Court's analysis commences, "as it should in every case addressing the reasonableness of a warrantless search, with the basic rule that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.'"   Gant, 556 U.S. at 338 (citing Katz v. United States, 389 U.S. 347, 357 (1967)).  As the challenged search occurred without a warrant, the Government "must prove that the . . . search came within some recognized exception to the Fourth Amendment warrant requirement."   United States v. Tibolt, 72 F.3d 965, 968-69 (1st Cir. 1995) (citing United States v. Doward, 41 F.3d 789, 791 (1st Cir. 1994), *cert. denied,* 514 U.S. 1074 (1995)).  Accordingly, the Government argues for the well-established search-incident-to-arrest exception.   See Id. ("Among the exceptions to the warrant requirement is a search incident to a lawful arrest." (citing Weeks v. United States, 232 U.S. 383, 392 (1914))).  "The exception derives from interests in officer safety and evidence preservation that are typically implicated in arrest

situations."  See Id. (citing United States v. Robinson, 414 U.S. 218, 230–234 (1973) and Chimel, 395 U.S. at 763).  "In *Chimel,* we held that a search incident to arrest may only include the arrestee's person and the area within his immediate control—construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence."  (internal quotations omitted).  Id. at 339.  "If there is no possibility that an arrestee could reach into the area that law enforcement officers seek to search, both justifications for the search-incident-to-arrest exception are absent and the rule does not apply."  Id. (citing Preston v. United States, 376 U.S. 364, 367–368 (1964)); See United States v. Cueto, 611 F.2d 1056 (5th Cir. 1980) (search of a suitbag under mattress improper since the defendants had been handcuffed and subdued and were in no position to reach concealed weapons or to grab and destroy evidence).

Taking a bit of a literary license, the Court understands the Government's argument to come in two separate, but related, versions.  The first is a straightforward argument that, immediately after Defendant's legal arrest, Agent Torres could legally search the dresser and fanny pack for weapons in the interests of officer safety because it was within Defendant's immediate control.  This first version was flatly rejected by the Magistrate Judge.  The second version is similar, but more nuanced.  This version requires an intersection between the search-incident-to-arrest and "consent" doctrines.  A proper understanding of this argument requires careful consideration of the sequence of facts.  First, the Government contends that Defendant consented to the opening of the dresser drawer.  Second, upon opening the drawer, Agent Torres saw the fanny pack.  Third, given Agent Torres' vast experience in the profession, he believed that the fanny pack probably contained a weapon.  Therefore, the Government reasons that

officer safety became a factor as soon as Agent Torres recognized that the fanny pack

may create a threat.  As such, the Government reasons that a search incident to arrest

was in order to ensure the safety of the arresting officers.  It should be noted that this

form of the argument was not made to the Magistrate Judge.  Yet, the Magistrate's

analysis of the first version applies just as effectively to the second:

> In this case, at the time Agent Torres opened the dresser, there was no realistic possibility that [Defendant] could reach the gun subsequently found inside the fannypack. [Defendant] was secured— handcuffed, with Agent Nuñez hovering over him—and the gun was in a closed container inside another closed [or open] container. The inside of the fannypack was thus not in [Defendant's] "immediate control," and so no search was permissible.

Docket No. 31, p. 16.  The Court must agree.[6]

Furthermore, the Court emphasizes that there were three other officers inside the

small apartment who would likely hear any scuffle created by Defendant's futile attempt

to gain possession of his handgun.  The presence of these additional officers makes it

even more unlikely that the handgun could be reached successfully.  However, even if

the three other officers were unable to participate in this hypothetical scuffle, a small

Defendant with his hands behind his back would have to get by the two much larger

officers in the small room on the way to grabbing and/or unzipping the fanny pack,

---

[6] The Court notes that even United States v. Ortiz, 146 F.3d 25, 28 (1st Cir. 1998), in which the First Circuit argued that a handcuffed arrestee has a "grab area" of most of a 10-foot by 10-foot room, is not to the contrary.  See also Nascimento, 491 F.3d at 51 n. 9.  Specifically, this extreme case stands for the proposition that a gun and cocaine found inside a dresser within this small room was within the handcuffed arrestee's immediate control.  However, contrary to the case at hand, the gun was much easier for said arrestee to obtain as it was not inside a closed container (i.e., a zipped fanny pack) within the dresser drawer.  Further, although it is not specified in the case, it seems to be implied that the bag of cocaine was transparent, which would allow the drugs to be seen without opening the bag; thus, "plain view" would allow its seizure.  If this were not the case, the opening of the bag could not occur absent a search warrant.  Moreover, the Court adds that a weapon inside a fanny pack that is in plain view, does not equate to the weapon itself being in plain view.

removing the handgun, and somehow aiming it at the officers from his back.  Needless to say, this factual scenario is implausible at best.

Although the burden is on the Government, its concise argumentation does not provide any case law that supports their search-incident-to-arrest positions in a case like this.  Further, in the interests of justice, both the undersigned and the Magistrate conducted comprehensive, independent research, which yielded no case law that would significantly tilt the scales in the Government's favor.  Moreover, even if a zipped fanny pack is in plain view, its contents are not.

Finally, the Court must emphasize the fact that, even if Agent Torres was one hundred percent certain that the fanny pack contained ammunition, which is unlikely, he should have and could have *seized* the fanny pack and attempted to obtain a search warrant instead of *searching* it without one.  See Horton, 496 U.S. at 141-42 and n. 11 ("the seizure of [a fanny pack] in plain view does not involve an intrusion on privacy" because "its seizure does not compromise the interest in preserving the privacy of its contents because it may only be opened pursuant to either a search warrant . . . or one of the well-delineated exceptions to the warrant requirement." (internal citations omitted)); see also Ross, 456 U.S. at 811-12 ("the Court reaffirmed the general principle that closed packages and containers may not be searched without a warrant." (interpreting Chadwick, 433 U.S. 1)).  For the foregoing reasons, this is not a case where officer safety or the destruction of evidence played any role: Defendant was significantly outnumbered, outmatched physically, and handcuffed behind his back.  See Tejada, 524 F.3d at 811–12.  There was "no possibility that [Defendant] could reach into" the inside of the zipped fanny pack, which is "the area that [the] law

enforcement officers [sought] to search," meaning that "both justifications for the search-incident-to-arrest exception are absent and the rule does not apply."  Id. (citing Preston, 376 U.S. at 367–368); See Cueto, 611 F.2d 1056 (search of a suitbag under mattress improper since the defendants had been handcuffed and subdued and were in no position to reach concealed weapons or to grab and destroy evidence).  In light of these circumstances, Agent Torres acted hastily and incorrectly in conducting a warrantless search of the fanny pack and his actions have resulted in the suppression of critical evidence in this case.

As we have established that none of the applicable exceptions to the search warrant requirement apply, this warrantless search is per se unreasonable under the Fourth Amendment.  See Gant, 556 U.S. at 338 (citing Katz, 389 U.S. at 357).  As to all other aspects of the report and recommendation that were not objected to, the Court finds no error, let alone "clear" or "plain error."

## V.    CONCLUSION

After careful reflection, in-depth inquiry, and tireless research, the Court hereby **ADOPTS** the Magistrate Judge's excellent report and recommendation **IN TOTO** and **INCORPORATES IT HEREIN BY REFERENCE**. Accordingly, Defendant's motion to suppress is hereby **GRANTED.**  The Government is to inform the Court **within five working days** of its next step in this case.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 14th day of January, 2016.

*/S/ Daniel R. Domínguez*
DANIEL R. DOMÍNGUEZ
United States District Judge